IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DENNIS P. SWEENEY,          :
                                 :
     Plaintiff,            :
                                 :
     v.                    :      Civil Action No.:  02-CV-4043
                                 :
THE STANDARD INSURANCE     :
COMPANY,                  :
                                 :
     Defendant.           :
                                 :

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendant, Standard Insurance Company ("Standard"), hereby files this

Memorandum in support of its Motion for Summary Judgment.

## I.      INTRODUCTION

Plaintiff, Dennis Sweeney ("Mr. Sweeney") has filed the instant action

against Standard, seeking a court ordered reversal of Standard's decision to deny his claim

for long term disability benefits under his employer's group benefit plan.  The parties have

agreed that Plaintiff's cause of action arises under the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

As is explained in detail below, Mr. Sweeney is a 56 year old former Vice

President and General Manager for Microsemi Corporation who left his job in October

2000. He is now seeking approximately $6,600.00 per month in long term disability

benefits until his 65th birthday.  Mr. Sweeney is claiming he is disabled due to

cardiovascular disease, ischemic colitis, gastritis, bipolar disorder, and post-traumatic

stress disorder.

Standard denied Mr. Sweeney's claim for benefits because the chart notes provided to Standard by his treating physicians showed that neither his physical ailments nor his mental disorders made Mr. Sweeney "unable to perform with reasonable continuity the material duties of his own occupation," as required by Standard's LTD plan. Specifically, although Mr. Sweeney began to experience problems with depression in mid-1999, his treating physician's notes show that his condition quickly improved and stabilized with medication, and Mr. Sweeney continued to work in his high stress job throughout 1999 and into 2000. Although he experienced a recurrence of problems with bipolar disorder in mid-2000, his doctors' notes show that he responded well to an adjustment to his medication. By September 2000, one month <u>before</u> he left his job, Mr. Sweeney described himself as feeling "the best I have felt in thirty years," and, less than two months later, his psychiatrist described the symptoms of his mental disorders as "by and large successfully treated with current medications." These and other medical records, prepared very close to the time Mr. Sweeney left his job, quite reasonably led Standard to conclude that his mental disorders were not disabling.

Similarly, chart notes from Mr. Sweeney's treating physicians show that his physical disorders did not require him to leave his job. Records from Mr. Sweeney's April 2000 hospitalization for chest pain showed that no medical intervention was deemed to be necessary. Chart notes regarding his gastrointestinal disorders describe these conditions as being "under good control" in July 2000, with "no abdominal pain or discomfort" reported just a few months after he stopped working. Significantly, although Mr. Sweeney's doctors now maintain that he was disabled, none of the chart notes they prepared <u>before</u> he

left his job in October 2000 make any reference to a medical need for him to stop working.

This case is ripe for disposition on summary judgment. As an ERISA case, the Court may not consider evidence that was not presented to Standard during its review of the claim. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3rd Cir. 1997). Thus, the undisputed facts are those set forth in the claims file attached to this Memorandum, with the Court being asked to decide whether Standard's denial of Mr. Sweeney's claim was an "arbitrary and capricious" decision. As recently stated by the Third Circuit, "[w]hether a decision was arbitrary and capricious requires the determination of whether there was a reasonable basis for the administrator's decision, based on the facts and circumstances known to the administrator at the time the decision was made." Smathers v. Muliti-Tool, Inc./Muliti Plastics, Inc. Health and Welfare Plan, 298 F.3d 191, 199-200 (3rd Cir. 2002). For the reasons set forth below, the record established that summary judgment in favor of Defendant and against Plaintiff is appropriate.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    Background.

Dennis Sweeney was employed as the Vice President and General Manager of the Radio Frequency Division of Microsemi Corporation in Montgomeryville, Pennsylvania. Mr. Sweeney held this position from January 1997 until October 1, 2000. Deposition of Dennis Sweeney ("Sweeney Dep.") at 35-36 ( relevant portions of transcript attached as Ex. 1 to Memorandum). In this position, Mr. Sweeney oversaw manufacturing

operations at several Microsemi plants.  Exhibit A to Affidavit of Linda Wheeler

("Wheeler Aff."), attached as Ex. 2 to Memorandum, at pp. 74-75. [1]

As an employee of Microsemi Corporation, Mr. Sweeney was covered by

the Microsemi long term disability insurance plan ("LTD Plan").  The LTD Plan, Group

Long Term Disability Policy No. 636480, was issued by Standard to Microsemi, effective

July 1, 1999.  Wheeler Aff. ¶ 3.

The LTD Plan provides employees such as Mr. Sweeney with LTD benefits

up to age 65, provided that the participant meets the following definition of disability:

> During the Benefit Waiting Period and the Own Occupation
> Period you are required to be Disabled only from your Own
> Occupation.
>
> You are Disabled from your Own Occupation, if as a result of
> Physical Disease, Injury, Pregnancy, or Mental Disorder, you are
> unable to perform with reasonable continuity the Material Duties of
> your Own Occupation.
>
> \* \* \* \* \* \*
>
> Own Occupation means any employment, business, trade,
> profession, calling or vocation that involves Material Duties of the
> same general character as your regular and ordinary employment
> with the Employer.  Your Own Occupation is not limited to your job
> with your Employer.
>
> \* \* \* \* \* \*

---

[1]    The LTD claim file that Standard maintained during the administrative processing of Mr. Sweeney's claim is before the Court in its entirety as Exhibit A to the Wheeler Affidavit. Wheeler Aff. ¶ 5.  References to specific documents in the administrative record are identified by the bates-numbers located on the lower right hand corner of each page, beginning with STND 255L-0001.  For the purposes of clarity, the file will be cited in this Memorandum by the bates-numbers.

> Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience generally required by employees from those engaged in a particular occupation.

Wheeler Aff., Ex. A, p.17.

The LTD Plan also includes "Allocation of Authority" language.  This language reserves to Standard, as the claims administrator, the right to determine eligibility for benefits:

> Except for those functions which the Group Policy specifically reserves to the Policyowner, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in its administration, interpretation, and application of the Group Policy.
>
> Our authority includes, but is not limited to:
>
> 1.    The right to resolve all matters when a review has been requested;
>
> 2.    The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;
>
> 3.    The right to determine:
>
>    a.    Eligibility for insurance;
>
>    b.    Entitlement to benefits;
>
>    c.    Amount of benefits payable;
>
>    d.    Sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.
>
>
> Subject to review procedures of the Group Policy, any decision that we make in the exercise of our authority is conclusive and binding.

Wheeler Aff., Ex. A,  p.35.

**B.      Mr. Sweeney Makes A Claim For Long Term Disability
          Benefits.**

On April 2, 2001, Mr. Sweeney submitted an application for long term

disability benefits to Standard.  As is shown in the application, Mr. Sweeney claimed that

he was unable to work beginning on October 1, 2000 due to cardiovascular disease,

ischemic colitis, severely diffused gastritis, bipolar disorder, and post traumatic stress

disorder.  Mr. Sweeney further indicated that, until the time he became disabled on

October 1, 2000, he was working "40 plus" hours per week.  Wheeler Aff., Ex. A, p. 83.

Mr. Sweeney's application for benefits was supported by Attending

Physician Statements ("APS") from Dr. Ralph Primelo, a psychiatrist, and Dr. John

Nuschke, an internist and Mr. Sweeney's primary care physician.  Dr. Nuschke diagnosed

Mr. Sweeney with cardiovascular disease, ischemic colitis, and bipolar disorder; Dr.

Primelo diagnosed him as suffering from bipolar disorder and post traumatic stress

disorder ("PTSD").  Wheeler Aff., Ex. A,  pp. 78, 81.

**C.      Standard Investigates And Denies Mr. Sweeney's Claim.**

Mr. Sweeney's claim was assigned to Jeffrey Webb, a Senior Disability

Benefits Analyst.  Mr. Webb began his investigation by contacting Mr. Sweeney's

employer, Microsemi Corporation, and his health care providers.  Wheeler Aff. ¶ 6.  Mr.

Webb learned from Microsemi Corporation that Mr. Sweeney's last active day at work was

October 1, 2000, although he had remained on the company's payroll in salary

continuation status until March 1, 2001.  Wheeler Aff., Ex. A, p. 276.  Micosemi advised

Mr. Webb that Mr. Sweeney did not take any significant leaves of absence for medical reasons prior to his October 1, 2000 last day worked, a fact confirmed by Mr. Sweeney in his deposition. Wheeler Aff., Ex. A, p. 276; Sweeney Dep. p. 18.

Mr. Webb also reviewed medical records obtained from Drs. Nuschke and Primelo, as well as Lehigh Valley Medical Center, to determine whether or not Mr. Sweeney was disabled by reason of his cardiovascular conditions, psychiatric disorder, or his gastrointestinal difficulties.   The results of this review are discussed in detail below.

**1.    Treating Physician Chart Notes Did Not Establish That Mr. Sweeney's Psychiatric Condition Was Disabling**

The records Mr. Webb obtained from Dr. Nuschke and Dr. Primelo indicated that Mr. Sweeney was not disabled because of a mental disorder.  Dr. Nuschke's records indicated that he had been treating Mr. Sweeney for symptoms of depression since mid-1999, and his condition had quickly stabilized after prescribing medication.  Wheeler Aff., Ex. A, pp. 302-303.   Dr. Nuschke's chart notes showed that, in May 1999, he placed Mr. Sweeney on a daily dosage of 10mg of Paxil.  Wheeler Aff., Ex. A, p. 302.  Dr. Nuschke next saw Mr. Sweeney on July 8, 1999, at which time he described him as "feeling much better after being placed on Paxil and resuming a normal exercise regimen." Wheeler Aff., Ex. A, p. 302.  On November 18, 1999, he described Mr. Sweeney as "really feeling much better" and "improved with Paxil."  Wheeler Aff., Ex. A, p. 303. According to Dr. Nuschke's notes, Mr. Sweeney's depressive symptoms remained stable until June 9, 2000, when he reported "increased agitation." Wheeler Aff., Ex. A,  p. 306.  Dr. Nuschke increased the Paxil dosage to 20 mg per day and referred him to a psychiatrist.  Just ten

days later, on June 19, 2000, Dr. Nuschke's chart notes regarding this "acute depressive

episode" indicate that Mr. Sweeney is "doing much better."  Wheeler Aff., Ex. A, p. 306.

Six weeks later, on July 28, 2000, Dr. Nuschke's notes regarding Mr. Sweeney's "bipolar

disorder" indicate that he "seems to be doing quite well, back on track." Wheeler Aff., Ex.

A, p. 306.  Dr. Nuschke did not see Mr. Sweeney again until November 14, 2000, six

weeks after he stopped working.  This four month absence of visits to Dr. Nuschke  (his

primary care physician) – coming at the very time Mr. Sweeney claims he was becoming

medically unable to work – is highly inconsistent with the notion that he was seriously  ill

at this point in time.

        Additionally, Dr. Primelo, a psychiatrist who began treating Mr. Sweeney

on October 31, 2000 (one month after he stopped working), reported during his first

consultation that Mr. Sweeney told him he was "emotionally as well as he had been in a

long time."  Wheeler Aff., Ex. A, p. 287. Although Mr. Sweeney told Dr. Primelo that he

had, in the past, experienced periods of irritability, poor sleep, racing thoughts, poor

concentration, and other symptoms of bi-polar disorder, he also told Dr. Primelo that

"these symptoms are by and large successfully treated with current medications" – a fact

consistently borne out by Dr. Nuschke's notes from 1999 and 2000. Wheeler Aff., Ex. A,

p. 286.  Dr. Primelo next saw Mr. Sweeney on December 1, 2000, when Mr. Sweeney

reported that he "feels pretty good," "was exercising a lot," his sleep and appetite were

"okay," and he was spending his "retirement" "babysitting [his] grandson." Wheeler Aff.,

Ex. A, p. 289.  When Dr. Primelo saw Mr. Sweeney next on January 8, 2001, Mr. Sweeney

told his psychiatrist he "does not feel he's depressed,"  was "sleeping great" and "happy

about how I feel." Wheeler Aff., Ex. A, p. 290.  At the next office visit, on February 23, 2001, Mr. Sweeney reported he "feels pretty good emotionally," was "happy about self and family," his "mood is good," and he "continues to sleep well."  Wheeler Aff. Ex. A p. 291.

According to the chart notes supplied by Dr. Primelo, Mr. Sweeney's next office visit occurred on March  23, 2001.  At that visit, Mr. Sweeney reported that he was "emotionally doing pretty well," his "appetite was good," he had no sleepless nights," his "anxiety is 80% improved," and "his concentration [is] improved."  Wheeler Aff., Ex. A, p. 484.  Thus, all of Dr. Primelo's records from October 31, 2000 through March 23, 2001 --- the entire time that Dr. Primelo had seen Mr. Sweeney -- showed that he was doing well.  Moreover, in these six visits, there is only one passing reference to the nightmares and flashbacks characteristic of PTSD, reflecting nothing more than a telephonic discussion of these symptoms between Dr. Primelo and Janet Grossner. Wheeler Aff., Ex. A, p. 288.

On the same day as the March 23, 2001 office visit, Dr. Primelo submitted an APS in support of Mr. Sweeney's application for disability benefits.  Despite having recorded in his chart notes that Mr. Sweeney was doing well, the APS painted a very different picture, describing Mr. Sweeney as suffering from, among other conditions, insomnia, racing thoughts, dysphoria (feeling sad), a poor appetite, and a lack of motivation.  Wheeler Aff., Ex. A, p. 78.  Though Mr. Sweeney may have reported having experienced such  conditions in the past to Dr. Primelo, these symptoms certainly were not

described as being present to any significant degree in any of Dr. Primelo's contemporaneous chart notes up to that point.

There was also substantial evidence in the file from which Mr. Webb could draw the conclusion that Mr. Sweeney had decided to leave the occupational stresses of an executive position for an alternative, lower stress lifestyle. On May 14, 1999, Mr. Sweeney told Dr. Nuschke that he had "lost interest in his job." Wheeler Aff., Ex. A, p. 302. On July 8, 1999, Dr. Nuschke reported that Mr. Sweeney was "considering altering his current employment." Wheeler Aff., Ex. A, p. 302. On May 26, 2000, Dr. Nuschke reported that Mr. Sweeney "seems to be gearing down and looking for a more docile lifestyle." Wheeler Aff., Ex. A., p. 305. And again on July 28, 2000, a full two months before he claimed to be unable to work because of a medical disability, Dr. Nuschke reported that Mr. Sweeney was "anticipating changing careers in the not too distant future." Wheeler Aff., Ex. A, p. 307. Conspicuously absent from Dr. Nuschke's notes was any indication that it was <u>medically necessary</u> for Mr. Sweeney to stop working because of his psychiatric condition.

### 2. Treating Physician Chart Notes Did Not Establish That Mr. Sweeney's Other Medical Conditions Were Disabling.

Records from Lehigh Valley Medical Center show that Mr. Sweeney had experienced chest pain on the evening of April 23, 2000 and underwent a cardiac catheterization which showed a normal ejection fraction (how much blood is being pumped out of the left ventricle with each heartbeat). He also was evaluated on an exercise treadmill stress test, where he had no chest pain, no shortness of breath, and no

EKG changes.  The hospital's discharge notes showed that his doctors determined that no immediate intervention was required, although the physician did recommend "aggressive risk management modification," including smoking cessation and diet control.  Wheeler Aff., Ex. A, pp. 315-319, 322.  Consequently, Mr. Webb concluded that the cardiac condition did not appear to be disabling. Wheeler Aff., Ex. A, pp. 397-400.

Mr. Webb also reviewed the medical records relating to Mr. Sweeney's gastrointestinal disorders, including ischemic colitis (restricted blood flow to the colon) and irritable bowel syndrome (an irregular bowel pattern accompanied by abdominal pain).  Dr. Nuschke's notes show that Mr. Sweeney's gastrointestinal symptoms were "under good control" on July 28, 2000.  Wheeler Aff., Ex. A, p. 307.  Although Mr. Sweeney was briefly hospitalized for ischemic colitis in December 2000, Dr. Nuschke indicated that the "symptoms have improved" with "no abdominal pain or discomfort" in a January 5, 2001 doctor's visit, and there is no indication that the condition prevented him from engaging in any of his activities of daily living.  Wheeler Aff., Ex. A, p. 309.  Likewise, although Mr. Sweeney was hospitalized briefly for gastritis at the end of January and early February 2001, he quickly recovered, as Dr. Nuschke reported that the "gastric biopsy . . . was within normal limits," he was "in no acute distress,"  and the condition "seems to be resolving."  Wheeler Aff., Ex. A, p. 310.

### 3.     Mr. Webb Arranges For A Review Of The File By Two Physician Consultants.

After reviewing the medical records, Mr. Webb engaged two independent physician consultants to review Mr. Sweeney's files on behalf of Standard.   Dr. George

Spady, a Board Certified Internist who periodically consults with Standard on disability claims, reviewed the  non-psychiatric records and reported to Mr. Webb that Mr. Sweeney's  conditions did not appear to be disabling. Wheeler Aff., ¶8, Ex. A, p. 389.  Dr. Spady found that the gastrointestinal disorders had required only brief periods of hospitalization and did not otherwise appear to be disabling.  Likewise, there was no evidence that the cardiovascular condition was disabling.  Wheeler Aff., Ex. A, p. 389

Dr. Esther Gwinnell, a Board Certified psychiatrist who also periodically reviews disability claims on behalf of Standard, reviewed the records from Drs. Nuschke and Primelo and concluded that the psychiatric conditions did not appear to be disabling. Wheeler Aff., ¶9, Ex. A, p. 387. Specifically, Dr. Gwinnell concluded that the chart notes showed that Mr. Sweeney was "psychiatrically quite stable" and there were no psychiatric symptoms sufficiently severe to make him unable to perform the material duties of his job. Wheeler Aff., Ex. A, p. 386.

### 4.    Mr. Webb Denies Mr. Sweeney's LTD Claim.

In a September 7, 2001 letter, Mr. Webb notified Mr. Sweeney that the medical evidence in the file did not establish that he was unable to work in the position of Vice President/General Manager due to either physical or psychiatric limitations.  Mr. Webb made Mr. Sweeney aware that he had the right to request a review of his claim and to submit additional information if he deemed it appropriate to do so.  Wheeler Aff., Ex. A, p. 400.

**D.     Mr. Sweeney Requests A Review Of The Denial.**

On October 31, 2001, through his counsel, James Huber of Huber and Waldron, Mr. Sweeney requested that Standard reconsider its decision to deny his claim for long term disability benefits.  Wheeler Aff., Ex. A, p. 414.  Mr. Huber submitted a letter to Standard accompanied by letters from Drs. Primelo and Nuschke, as well as letters from Janet Grossner, a social worker who was counseling Mr. Sweeney, and Virginia Winn, one of Mr. Huber's co-workers.  All of these letters were written shortly after Mr. Sweeney learned that his claim for benefits had been denied.  Wheeler Aff., Ex. A, p. 414.  Because most of the information contained in these letters related to Mr. Sweeney's mental status, Mr. Webb asked Dr. Gwinnell to review the additional information.

In a report dated November 7, 2001, Dr. Gwinnell concluded that these letters did nothing more than "dispute the conclusions without providing concurrently maintained progress notes or information which was recorded at the time of his cease work."  Wheeler Aff., Ex. A, p. 425.  In the absence of contemporaneous medical records establishing that Mr. Sweeney was unable to perform the material duties of his Vice President/General Manager job prior to October 1, 2000, these records did not provide any additional evidence of disability.

On November 7, 2001, Mr. Webb also sought additional medical records from Ms. Grossner and Dr. Yelena Yermak, the psychiatrist who treated Mr. Sweeney before Dr. Primelo.  Wheeler Aff., Ex. A, p. 417.  Dr. Yermak's records were received by

Mr. Webb on December 10, 2001.  Wheeler Aff., Ex. A, p. 440.  As is explained below, the information contained in these records further supported Standard's conclusion that Mr. Sweeney was not disabled by his psychiatric disorders.

Dr. Yermak's notes show that she first saw Mr. Sweeney on June 15, 2000. Dr. Yermak diagnosed Mr. Sweeney as suffering from bipolar disorder, and recommended that he add mood stabilizers to his Paxil regimen and stop drinking. Significantly, Dr. Yermak did not make even a passing reference to the impact of Mr. Sweeney's job on his condition, much less recommend that he leave that position.  Wheeler Aff., Ex. A, p. 434. Dr. Yermak saw Mr. Sweeney again on June 27, 2000, and her chart notes indicate that he was "calm, cooperative," his affect was "normal," and his mood was "fine."[2]  Wheeler Aff., Ex. A, p. 435.  Dr. Yermak's notes indicate that Mr. Sweeney 's condition worsened in August when he stopped taking his Paxil, but quickly improved when he resumed his medication.  Wheeler Aff., Ex. A, pp. 437-438.  On September 12, 2000, just two weeks before Mr. Sweeney stopped working, he reported to Dr. Yermak that "I feel the best I have felt in 30 years."  Wheeler Aff., Ex. A, p. 438.  On October 3, 2000, just two days after stopping work, Sweeney reported "I am great," and Dr. Yermak described him in her chart notes of that  date as "doing very well."  Wheeler Aff., Ex. A, p. 439.

---

[2]   Though she mentions that he had "cut back on the hours he was spending at work" in these notes, Dr. Yermak does not indicate that this was necessary or even a factor in his improved mental status.

On January 9, 2002, Mr. Webb wrote to Mr. Huber and advised him that, after reviewing the additional information obtained from Dr. Yermak, as well as the records provided by Mr. Huber in his October 31, 2001 letter, Standard stood by its decision to deny Mr. Sweeney's claim for benefits. Wheeler Aff., Ex. A, p. 443.

At the time Mr. Webb sent his letter on January 9, 2002, he had not yet received Janet Grossner's records, despite having made written requests for them in November and again in December. Wheeler Aff., Ex. A, pp. 417, 426. Mr. Webb proceeded with his decision to deny the claim without Ms. Grossner's records because it had already been over two months since Mr. Huber requested reconsideration of the decision, and, under the terms of the Microsemi Group Policy, Standard was obligated to notify Mr. Sweeney of its decision on a request for review of a denial within 60 days of its receipt of his request for review, absent special circumstances. [3] Affidavit of Jeffrey Webb ("Webb Aff.") at ¶6, attached as Ex. 3 to Memorandum. Once Mr. Webb sent out his denial, Mr. Sweeney's claim was referred to Standard's Quality Assurance Unit for an independent review of Mr. Sweeney's claim. Webb Aff. ¶ 4.

On the same day that the case was sent to the Quality Assurance unit, Ms. Grossner's records were received by Standard. Webb Aff ¶7. The file was immediately returned to Mr. Webb, who then considered the impact of these records. Webb Aff. ¶7.

_____

[3] On January 4, 2002, Mr. Webb wrote to Mr. Huber and notified him that Ms. Grossner still had not supplied the requested records despite multiple requests and, as a result, Standard was proceeding with its review based on the records in its possession at that time. Wheeler Aff., Ex. A. p. 441.

Ms. Grossner's notes revealed that she began counseling Mr. Sweeney in July 2000, and focused on treating his PTSD stemming from childhood physical abuse by his father.  Her treatment plan involved getting Mr. Sweeney to discuss his history of trauma, continuing with his anti-depressants, and abstinence from alcohol.  As was the case with Dr. Yermak, her  notes do not indicate that it was <u>medically necessary</u> for Mr. Sweeney to cease work.  Wheeler Aff., Ex. A., p. 469.  Moreover, as was the case with Dr. Yermak, notes from early September indicated that Mr. Sweeney was "feeling much better" (Wheeler Aff., Ex. A., p. 449), and her October 13, 2000 notes refer to Mr. Sweeney's decision to leave work as "retirement," further indicating that the decision was a voluntary one.  Wheeler Aff., Ex. A, p. 451.

On February 6, 2002, Mr. Webb had Dr. Gwinnell review Dr. Yermak's and Ms. Grossner's records.  After reviewing the notes, Dr. Gwinnell concluded that Ms. Grossner's records, like those of Dr. Yermak, supported the conclusion that "Mr. Sweeney made a decision to cease work unrelated to his psychiatric condition," and there was "no documentation of psychiatric illness of such severity to prevent Mr. Sweeney from functioning in his own occupation at the time that he ceased work through well into the year 2001."  Wheeler Aff., Ex. A, p. 475.

On February 22, 2002, Mr. Webb notified Mr. Huber that Ms. Grossner's records had been received and reviewed.  Mr. Webb explained that the records had also been reviewed by Dr. Gwinnell, who concluded that the information does not support Mr. Sweeney's contention that this mental health condition made him unable to work in

October 2000.  Accordingly, Mr. Sweeney's case was referred to the Quality Assurance

Unit for an independent review.  Wheeler Aff., Ex. A, p. 477.

        **E.**        **The Quality Assurance Unit Conducts An Independent Review.**

Mr. Sweeney's claim was assigned to Linda Wheeler, a Benefits Review

Specialist in the Quality Assurance unit.  Ms. Wheeler has more than 15 years experience

reviewing long term disability claims for Standard.  Wheeler Aff. ¶ 2.

After reviewing Mr. Sweeney's file in its entirety, Ms. Wheeler arranged to

have it examined by yet another independent physician consultant, Dr. Bradley Fancher.

Dr. Fancher is a Board Certified Internist who periodically reviews disability claims for

Standard.  Wheeler Aff. ¶ 10; Ex. A, p. 493.

On April 19, 2002, Dr. Fancher submitted to Ms. Wheeler a report detailing

the results of his file review. In the report, Dr. Fancher explained in detail the reasons why

the non-psychiatric aspects of Mr. Sweeney's condition did not appear to be disabling.  In

sum, Dr. Fancher concluded as follows:

- After Mr. Sweeney was admitted to the hospital in April 2000 for chest pain, a cardiac catheterization revealed a normal ejection fraction. Additionally, an exercise treadmill stress  test and a thallium perfusion study showed no evidence of myocardial ischemia (a reduced blood supply of the heart which causes the chest pain of angina);

- Ischemic colitis tends to be acute in nature, but with intermittent presentations and long periods of remission. Moreover, it is unrelated to stress, and there was no indication that Mr. Sweeney had any episodes beyond the one incident in December of 2000;

- Mr. Sweeney's leukocytosis condition (an elevated white blood cell count) was something he had lived with for a long time, it did not appear to cause any symptoms, and occupational stress could not be expected to have any impact on the condition;

- Gastritis was capable of being successfully treated through use of proton pump inhibitors (a medication), and should not have been causing long term occupational impairment;

- Barrett's esophagus, which is related to esophageal reflux, should not be expected to cause any symptoms and can easily be treated with medical management and, therefore, it is not common medical practice to have persons suffering from this condition avoid occupational stress; and

- Irritable bowel syndrome should not have been disabling so long as reasonable access to a restroom was available. Moreover, the symptoms of the condition can usually be easily treated with medical management.

Wheeler Aff., Ex. A, pp. 492-494.

In addition to Dr. Fancher's review, Linda Wheeler engaged a highly respected cardiologist, Dr. Henry DeMots, to review Mr. Sweeney's file.  As is set forth in his attached curriculum vitae, Dr. DeMots has Board Certification with the National Board of Medical Examiners, the American Board of Internal Medicine and the American Board of Internal Medicine, Cardiovascular Disease.  He has extensive experience in the cardiovascular field of medicine, sits on numerous cardiac related committees or associations, and has authored or co-authored numerous cardiac related articles.  Wheeler Aff., Ex. B.

On May 20, 2002, Dr. DeMots submitted to Standard a cardiology file review report.  Dr. DeMots concluded that Mr. Sweeney's coronary artery disease was not disabling because it was deemed to be so mild at the time of his April 2000 catheterization that no medical intervention was considered.  Moreover, Mr. Sweeney demonstrated good exercise tolerance during an exercise treadmill test.  Accordingly, Dr. DeMots concluded that there was no objective evidence to indicate an occupational limitation based on his ischemic heart disease.  Wheeler Aff., Ex. A, p. 512.

Ms. Wheeler also consulted with Dr. Gwinnell regarding assertions made by Mr. Sweeney's counsel about the psychiatric disability.  Specifically, in a March 28, 2002 letter, Mr. Huber argued -- without medical support – that "Mr. Sweeney's improvement while not at his job is further evidence that his job stress was a substantial cause of the psychological and psychiatric illness."  Aff., Ex. A, p. 482.  On April 10, 2002, Mr. Wheeler consulted Dr. Gwinnell to discuss this assertion.  Dr. Gwinnell advised

Ms. Wheeler that the medical records showed that Mr. Sweeney's psychiatric state had

improved in September 2000, even before he had stopped working, and had continued to

improve thereafter.  Dr. Gwinnell further advised Ms. Wheeler that the evidence showed

that Mr. Sweeney had experienced symptoms of a psychiatric disorder for a number of

years, but had continued to work despite those symptoms.  Wheeler Aff., Ex. A, p. 563.

On June 14, 2002, Ms. Wheeler sent to Mr. Huber a detailed, 9 ½  page

letter concerning the Quality Assurance Unit's review of Mr. Sweeney's claim.  Ms.

Wheeler explained that, after reviewing all of the medical records in the file, as well as

information from Mr. Sweeney's employer, the Quality Assurance Unit had determined

that Mr. Webb's decision to deny the claim was the correct one.  Wheeler Aff., Ex. A, p.

574.

### III.    LEGAL STANDARD

Summary judgment is appropriate when, as in this case, "there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  The burden is on the moving party to demonstrate

that the evidence creates no genuine issue of material fact, and an issue is "genuine" only if

the evidence is such that a reasonable jury could find in favor of the non-moving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Factual disputes that are

irrelevant or unnecessary should be disregarded in the analysis.  Id. at 248.  In order to

defeat a motion for summary judgment, the non-moving party may not rest upon the mere

allegations of the pleadings but must go beyond the pleadings and demonstrate that

sufficient evidence exists to create a genuine issue for trial.  Carlson v. Arnot-Ogden

Mem'l Hosp., 918 F.2d 411, 413 (3d Cir. 1990).  The non-moving party must do more than

simply rest upon mere allegations, vague statements, or general denials.  Trap Rock Indus.,

Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992).  The Court must grant summary

judgment against the party that "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV.    LEGAL ARGUMENT

### A.    Standard's Decision Should Be Reviewed Under The Arbitrary And Capricious Standard Of Review.

Under ERISA, when a benefit plan gives the Administrator "discretionary

authority to determine eligibility for benefits or to construe the terms of a plan," a

reviewing court may not overturn the claim administrator's determination unless the claim

administrator abused its discretion in denying benefits.  Firestone Tire & Rubber Co. v.

Bruch, 489 U.S. 101, 114-15 (1989).  "Where the benefit plan gives the administrator or

fiduciary authority to determine eligibility for benefits or construe the terms of the plan,

the denial of benefits is reviewed under the arbitrary and capricious standard."  Courson v.

Bert Bell NFL Player Retirement Plan, 214 F.3d 136, 142 (3d Cir. 2000);  Abnathya v.

Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993).

As an initial matter, the Court must determine whether the ERISA plan

confers discretionary authority on the Administrator.  The LTD Plan at issue includes

"Allocation of Authority" language which clearly satisfies the Firestone standard.  This

language reserves to Standard, as the claims administrator, the right to determine eligibility

for benefits:

> Except for those functions which the Group Policy specifically reserves to the Policyowner, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in its administration, interpretation, and application of the Group Policy.
>
> Our authority includes, but is not limited to:
>
> 1.    The right to resolve all matters when a review has been requested;
>
> 2.    The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;
>
> 3.    The right to determine:
>
> > a.    Eligibility for insurance;
> >
> > b.    Entitlement to benefits;
> >
> > c.    Amount of benefits payable;
> >
> > d.    Sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Subject to review procedures of the Group Policy, any decision that we make in the

exercise of our authority is conclusive and binding.  Wheeler Aff., Ex.A. p.35.

This language confers discretionary authority on Standard as the fiduciary

to determine Plaintiff's entitlement to benefits under the Plan.  Indeed, this identical

language has been held to confer discretionary authority upon Standard (and thereby

warrant application of the deferential arbitrary and capricious standard) in other cases

involving disability benefits under ERISA.  See Bendixen v. Standard Ins. Co., 185 F.3d

939, 943 (9th Cir. 1999); Dunn v. Standard Ins. Co., 156 F. Supp.2d 227 (D. Conn. 2001);

Kocsis v. Standard Ins. Co., 142 F. Supp. 2d 241, 251-52 (D. Conn. 2001); Ezell v. Dan

River, Inc., 117 F. Supp.2d 534 (W.D. Va. 2000); Ehrensaft v. Dimension Works Inc.

Long Term Disability Plan, 120 F.2d 1253 (D. Nev. 2000); Stills v. GMBC Healthcare,

Inc., 48 F. Supp.2d 495, 498 (D. Md. 1999); Newman v. Standard Ins. Co., 997 F. Supp.

1276, 1278 (C.D. Cal. 1998); Fergus v. Standard Ins. Co., 27 F. Supp.2d 1247, 1253-1254

(D. Or. 1998); Kaus v. Standard Ins. Co., 985 F. Supp. 1277, 1278, 1281 (D. Kan. 1997);

Andrews v. Standard Ins. Co., 2000 U.S. Dist. Lexis 5988, *10-12 (N.D. Ill. 2000).

      For these reasons, this Court should review Standard's decision to deny Mr.

Sweeney's claim for benefits under the deferential arbitrary and capricious standard of

review. "Under this deferential standard, a plan administrator's interpretation of a plan

may be disturbed 'only if it is without reason, unsupported by substantial evidence or

erroneous as a matter of law.'" Courson, 214 F.3d at 142 (*quoting* Abnathya, 2 F.3d at

45). "This scope of review is narrow, and 'the court is not free to substitute its own

judgment for that of the defendants in determining eligibility for plan benefits.'"

Abnathya, 2 F.3d at 45 (citation to internal quotation omitted).

      "Whether a decision was arbitrary and capricious requires the determination

of whether there was a reasonable basis for the administrator's decision, based on the facts

and circumstances known to the administrator at the time the decision was made."

Smathers v. Muliti-Tool, Inc./Muliti Plastics, Inc. Health and Welfare Plan, 298 F.3d 191,

199-200 (3rd Cir. 2002). The Court's review is limited to the "evidence that was before

the administrator when it made the decision being reviewed." Oslowski v. Life Insurance

Co. of North America, 139 F. Supp.2d 668, 675 (W.D. Pa. 2001), citing Mitchell v.

Eastman Kodak Company, 113 F.3d 433, 440 (3rd Cir. 1997); Cimino v. Reliance

Standard Life Insurance Co., 2001 WL 253791, *4, n. 5 (E.D. Pa. 2001).  Consequently,

the Court may not consider additional evidence submitted in support of a claim for benefits

if it was not submitted to the insurance company during the claims review process.

Additionally, in a case such as this, where the insurance company both

funds the disability plan and administers the plan, the Defendant is subject to the

"heightened arbitrary and capricious" analysis established in Pinto v. Reliance Standard

Life Insurance Co., 214 F.3d 377 (3rd Cir. 2000).  Under such an analysis, the Court must

look at both the result reached by Standard, as well as the process by which the result was

achieved.  Id. at 393.

     **B.**    **Standard's Decision to Deny Plaintiff's Claim is
Supported by Substantial Evidence.**

          **1.**    **Contemporaneous Treating Physician Chart Notes
Do Not Support a Finding of Disability Based
Upon a Mental Disorder.**

Standard's conclusion that Mr. Sweeney was not disabled by either bipolar

disorder or post traumatic stress disorder finds ample support in the contemporaneous chart

notes prepared by his treating physicians, Drs. Nuschke, Primelo, and Yermak, as well as

those of his social worker, Janet Grossner.  Chart notes from Dr. Nuschke, beginning in

May 1999 and continuing through November 2000, indicate that Mr. Sweeney saw Dr.

Nuschke on ten occasions during that 18 month span.   During the first visit, Dr. Nuschke

reported that Mr. Sweeney had symptoms of depression, and placed him on 10 milligrams

of Paxil.  Dr. Nuschke notes indicate that the condition remained stable for almost an entire

year, even though Mr. Sweeney continued to work in his high stress Vice

President/General Manager position for Microsemi Corporation.  In fact, chart notes from

mid- and late 1999 indicate that Mr. Sweeney was "improved with Paxil" and "feeling

much better" during that period.  Wheeler Aff., Ex A, p. 303.   Although Mr. Sweeney did

experience another incident of depression in June 2000, he was described as doing "quite

well" and "back on track" just one month later. Wheeler Aff., Ex A, p. 306.    In fact, Mr.

Sweeney did not even see Dr. Nuschke again until November 2000, a fact which seems to

belie his argument that he was so ill as to be medically incapable of working by October

2000.

        Chart notes from Mr. Sweeney's psychiatrist, Dr. Yermak, begin in June

2000, and diagnose him as suffering from bipolar disorder.  Wheeler Aff., Ex A, p. 434.

The notes make no reference to post traumatic stress disorder, and make absolutely no

reference whatsoever to any need for him to stop working.  Id.  Two weeks after his first

visit, Dr. Yermak describes him as "calm [and] cooperative," with a "fine" mood and a

"normal" affect. Wheeler Aff., Ex A, p. 435.  Two weeks before he stopped working, Dr.

Yermak reported that he was "the best I have felt in 30 years." Wheeler Aff., Ex A, p. 439.

        Dr. Yermak stopped treating Mr. Sweeney in October 2000, at which time

Dr. Primelo became his psychiatrist.  During his first visit on October 31, 2000, Dr.

Primelo described Mr. Sweeney as "by and large successfully treated with medications."

Wheeler Aff., Ex A, p. 286.  Over the next four months, Dr. Primelo saw Mr. Sweeney on

a monthly basis, and the chart notes are replete with phrases such as "feels pretty good,"

"does not feel he's depressed," "sleeping great," "happy about how I feel," "emotionally

doing pretty well," and "happy about self and family." Wheeler Aff., Ex A, pp. 289-291; 484.

        Likewise, chart notes provided by Janet Grossner, the social worker who was treating Mr. Sweeney for his post traumatic stress order, did not portray him as being medically unable to work. Indeed, like the notes of Dr. Yermak, Ms. Grossner's chart notes make absolutely no reference whatsoever to a need for him to stop working. Wheeler Aff., Ex A, p. 469. Similarly, her notes from a visit approximately one month before he stopped working describe him as "feeling much better." Wheeler Aff., Ex A, p. 449.

        The notes of these mental health providers hardly depict an individual who was so ill as to be incapable of performing "with reasonable continuity the material duties of his own occupation" of Vice President and General Manager of Microsemi's RF Division. To the contrary, these notes, which span a period of approximately 18 months prior to his last day of work, portray an individual who had three episodes of depression (May 1999, June 2000, and August 2000), each of which was described by his doctors as being successfully treated through the use of medication. Not only do the chart notes describe Mr. Sweeney as having a condition which is well controlled by medication, they also show that he appears to have been able to work as a Vice President and General Manager, with all the accompanying stress of this high level executive position, throughout 1999 and into mid-2000. Just weeks before he stopped working, Mr. Sweeney's psychiatrist described him as feeling the best he has felt in 30 years – even though Mr. Sweeney reported in his application for benefits that he was working "40 plus" hours per

week at this time.  Wheeler Aff., Ex A, p. 83.  Thus, the records provided to Standard by Mr. Sweeney's mental health care providers simply do not support his claim for long term disability benefits.

### 2.    Contemporaneous Chart Notes Do Not Support A Finding of Physical Disability.

The chart notes supplied by Mr. Sweeney's treating physicians also do not establish that he was unable to work because of his physical conditions.   Medical records from Lehigh Valley Medical Center showed that he had a normal ejection fraction and completed an exercise treadmill test with no indication of cardiac distress.  Moreover, the doctors treating him for his heart condition in April 2000 deemed medical intervention to be unnecessary, opting instead to prescribe a course of smoking cessation, diet control, and related risk management modification.  Three independent physicians – Dr. Spady, Dr. Fancher, and  renowned cardiologist Dr. DeMots, reviewed Mr. Sweeney's file and concluded that these records established that the cardiac condition was not disabling.

Likewise, Mr. Sweeney's medical records did not establish that his gastrointestinal disorders (gastritis, ischemic colitis, irritable bowel syndrome, and Barrett's Esophagus) did not appear to be disabling.  Dr. Nuschke's chart notes described these conditions as "under good control" in July 2000 (Wheeler Aff., Ex. A, p. 307), with "no abdominal pain or discomfort" in January 2001. Wheeler Aff., Ex. A, p. 309.  In February 2001, Dr. Nuschke described the gastritis as a condition which "seems to be resolving." Wheeler Aff., Ex. A, p. 310.  These records, along with those regarding Mr. Sweeney's two brief periods of hospitalization (December 8-15, 2000 and January 29 to February 4, 2001) were reviewed by Drs. Spady and Fancher, both of whom concluded

that these conditions should not have rendered Mr. Sweeney medically unable to perform

the material duties of his Vice President/General Manager position.

       **3.      Treating Physician Notes Indicate That Mr. Sweeney's Decision to Leave Work Was a Lifestyle Choice.**

      The chart notes supplied by Mr. Sweeney are replete with references to his

desire to leave the occupational stresses of an executive position for an alternative, lower

stress lifestyle.  In May 1999, Mr. Sweeney told Dr. Nuschke that he had "lost interest in

his job." Wheeler Aff., Ex A, p. 302.   In July 1999, he told Dr. Nuschke that he was

"considering altering his current employment."  Wheeler Aff., Ex A, p. 302.  In March

2000, Dr. Nuschke's notes state that the doctor would "like to see [Mr. Sweeney] getting

some time to himself and delegating some of the responsibility of his work." Wheeler Aff.,

Ex A, p. 304.   Dr. Nuschke's May 2000 notes refer to he and Mr. Sweeney having had a

"lifestyle talk," as well as Mr. Sweeney's "gearing down and looking for a more docile

lifestyle as a means of promoting his long term well being." Wheeler Aff., Ex A, p. 305.

Aside from Dr. Nuschke's notation that he would "like" to see Mr. Sweeney delegate some

of his work responsibilities, there is not a single reference to Dr. Nuschke telling Mr.

Sweeney that it was <u>medically necessary</u> for him to leave his job.

      Mr. Sweeney also told both Janet Grossner and Dr. Primelo that he had

"retired" -- an odd comment to make to a healthcare provider who supposedly was

recommending to him that it was medically necessary for him to stop working.  In Dr.

Primelo's case, Mr. Sweeney referred to how he was spending his "retirement" babysitting

his grandson.  Wheeler Aff., Ex. A., p.289.  On October 13, 2000, just two weeks after he

stopped working, Mr. Sweeney told Ms. Grossner that he was "struggling not to over schedule his post-retirement life."  Wheeler Aff. Ex. A, p. 451.

These references in Dr. Nuschke's, Dr. Primelo's, and Ms. Grossner's notes -- combined with the absence of any reference in Dr. Yermak's notes to a medical necessity  for him to stop working -- reasonably led Standard to conclude that Mr. Sweeney had made a lifestyle choice.  Faced with a high paying, high stress job that required international travel and demanding hours, Mr. Sweeney chose to remove himself from that stress and "look for a more docile lifestyle."  Wheeler Aff. Ex. A, p. 305. While this decision is certainly one which could improve an individual's health, the question before the Court is whether Mr. Sweeney was <u>medically unable to work</u>, not whether his lifestyle would improve if he was to move to a lower stress job.  If disabled, Mr. Sweeney stood to receive a monthly benefit in excess of $6,600.00, and, before paying such a substantial benefit, Standard has a duty to its policy owners to ensure that there is medical evidence in the file showing that Mr. Sweeney was "unable to perform with reasonable continuity the material duties of his own occupation."  The evidence in Mr. Sweeney's file simply does not show the inability to perform those duties.

**B.      Standard's Decision To Deny Benefits Is
         Supported By Controlling Law.**

Several recent decisions from this Court and its sister Western District of Pennsylvania support a finding that Standard's decision to deny Mr. Sweeney's benefits was not arbitrary and capricious.   For example, in <u>Cimino v. Reliance Standard Life Insurance Co.</u>, 2001 WL 253791 (E.D. Pa. 2001), the plaintiff claimed she was disabled because of anxiety and depression that made her unable to work beginning in December

1996.  Similar to the instant matter, <u>after</u> her claim was denied, the plaintiff in <u>Cimino</u>

obtained a report from a psychiatrist indicating that she was medically unable to work.

Like Standard, the defendant insurance company in <u>Cimino</u> relied upon "substantial

evidence in the medical record" to deny plaintiff's claim.  Similar to Mr. Sweeney, within

a few weeks of stopping work, the plaintiff's treating physician chart notes showed that she

had "improved" and "responded well to medications."  Several weeks later, her chart notes

described her as "improved but still quite anxious;" three months later she was described

as "feeling pretty good" and, shortly thereafter, "seems to be feeling a little better."  Based

upon these contemporaneous charts notes -- prepared nearly two years before a

psychiatrist's report indicated she was disabled -- Judge Reed concluded that "a reasonable

fact finder could not find that the decision of Reliance Standard to deny Cimino's claim for

long term disability benefits was unreasonable." 2001 WL 253791 at *6.

    Similarly, in <u>Hevener v. Paul Revere Life Insurance Co.</u>, 2002 WL 1969492

(E.D. Pa. 2002), the Court granted summary judgment to the insurance company where the

"disability determination was largely based upon [attending physician's] diagnoses and

treatment notes."  Judge Padova held that the insurer's decision to deny the claim for long

term disability benefits was not arbitrary and capricious, even though the plaintiff's

treating physician had written a letter to the insurer stating that the plaintiff was "totally

disabled from work due to her lower back disorder."  <u>Id</u>. at *5.  Finding that this

statement, written one month <u>after</u> the insurer denied the claim,  "lacks specificity or

support in the objective medical records contained in the claims file," the Court relied

instead on  the treating physician's contemporaneous chart notes  and statements prepared

<u>before</u> the LTD claim was denied, all of which showed that the plaintiff was capable of performing sedentary work. <u>Id</u>.

Likewise, in <u>Oslowski v. Life Insurance Co. of North America</u>, 139 F. Supp.2d 668 (W.D. Pa. 2001), the court granted summary judgment to the insurer in a claim for long term disability benefits brought by a plaintiff suffering from depression. Similar to the instant matter, in <u>Oslowski</u>, the plaintiff's treating physicians records showed that she was able to "function relatively well" so long as she took Paxil. <u>Id</u>. at 673. The Court relied on the treating physician's notes and letters to conclude that the plaintiff was able to perform some type of work and, therefore, ineligible for further benefits.

### C.     Standard's Decision To Deny Plaintiff's Claim Was Procedurally Sound.

Under the <u>Pinto</u> analysis, the Court should also look at the process by which Standard made its decision to deny Mr. Sweeney's claim. In this case, that process is procedurally sound. First, Standard reviewed Mr. Sweeney's claim three separate times -- an initial review by Jeffrey Webb, a supplemental review by Mr. Webb, and an independent review by Linda Wheeler in the Quality Assurance Unit. Throughout that process, Mr. Webb requested and received additional medical records from Dr. Yermak and Ms. Grossner, and each time reviewed those records and had them analyzed by an independent physician consultant.

Moreover, Standard had four separate independent physician consultants review Mr. Sweeney's records. Dr. Gwinnell reviewed the mental health records four separate times to determine whether or not there was any evidence of a mental disability. Dr. George Spady, an internist, reviewed Mr. Sweeney's other medical records, as did

internist Dr. Bradley Fancher. Dr. Henry DeMots, a renowned cardiologist, reviewed the records from Lehigh Valley Medical Center to determine if there was any evidence of a cardiac condition that was disabling. These multiple reviews by independent physicians, each of whom had expertise in the subject matter being reviewed, are strong indicia of procedural fairness.

Moreover, unlike <u>Pinto</u>, there is no evidence of procedural anomalies which would render a decision improper under the heightened arbitrary and capricious standard of review. Unlike the <u>Pinto</u> decision, there is no evidence that Standard reversed an initial determination that Mr. Sweeney was disabled without receiving additional medical information. Likewise, there is no evidence that Standard relied in a "self-serving" manner on selected portions of a particular doctor's report, while rejecting other portions of the records. The evidence shows that Standard relied upon a multitude of entries in the contemporaneous chart notes of Mr. Sweeney's doctors, and, quite legitimately, rejected the conclusory letters prepared by Drs. Nuschke and Primelo (as well as Ms. Grossner) after Mr. Sweeney's benefits claim has been denied because these letters did nothing more than "dispute the conclusions without providing concurrently maintained progress notes or information which was recorded at the time of his cease work." Wheeler Aff., Ex. A, p. 425. Finally, unlike the <u>Pinto</u> case, there is no evidence that Standard's own benefits reviewers had initially recommended the payment of benefits. Accordingly, unlike Pinto, there is no evidence of procedural irregularities from which the Court could find that Standard's decision was arbitrary and capricious.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant, Standard Insurance Company, respectfully requests that this Court grant its Motion for Summary Judgment as to all claims in Plaintiff's Amended Complaint.

Respectfully submitted,

_____
Jennifer E. Clark
Attorney for Defendant
Standard Insurance Company

Date:  January 9, 2003.

Piper Rudnick LLP
3400 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
(215) 656-3300

Of counsel:
Eric Paltell
Kollman & Saucier, P.A.
8th Floor
20 South Charles Street
Baltimore, Maryland 21201-3225
(410) 727-4300