IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENNIS P. SWEENEY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.: 02-CV-4043 |
| | * | |
| THE STANDARD INSURANCE COMPANY, | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, Standard Insurance Company ("Standard"), hereby files this combined Opposition to Plaintiff's Motion for Summary Judgment and Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

In his Motion, Plaintiff argues that Defendant's denial of his claim for long term disability benefits was arbitrary and capricious. As support for his argument, Plaintiff maintains that there were "procedural anomalies" in the process by which Standard reviewed his disability claim. In his Opposition, Plaintiff further argues that Standard "cherry-picked" isolated references in his treating physician chart notes to improperly depict him as being medically able to continue working.

Defendant concedes that, where, as here, the Defendant insurance company both administers the policy and pays the claim, its decision is subject to a "heightened" form of the

arbitrary and capricious standard of review. Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3rd Cir. 2000); Sapovits v. Fortis Benefits Insurance Co., 2002 WL 31923047 (E.D. Pa. 2002). Plaintiff alleges that there are "procedural irregularities" in Standard's decision-making process which warrant a "high degree of skepticism" from this Court. The fact that there are irregularities in the decision-making process may heighten the scrutiny, but does not, by itself, warrant a finding that the decision is arbitrary and capricious. Dorsey v. Provident Life and Accident Insurance Company, 167 F. Supp.2d 846, 854 (2001).

As set forth more fully below, Defendant maintains that the purported "procedural anomalies" in this case do not warrant a "high degree of skepticism." Each of the alleged irregularities is explainable and justifiable under the circumstances. Moreover, even under a less deferential standard of review, the undisputed facts, as set forth in the record before this Court, establish that Standard's decision to deny Mr. Sweeney's claim for benefits was not arbitrary and capricious.

**I.  Standard Did Not Act Improperly By Making Its Initial Denial Without All Treating Physician Records.**

Plaintiff argues that Standard acted improperly when it initially denied his claim in September 2001 before it had received medical records from his first psychiatrist, Dr. Yermak, and his counselor, Janet Grossner. It is undisputed that Standard had in its possession the full medical records from his primary care provider, Dr. John Nuschke, as well as the complete records of his second psychiatrist, Dr. Primelo, who began treating him immediately after he left employment. It is also undisputed that Standard had in its possession the complete records from

each of his hospitalizations.

When Plaintiff took the deposition of Dr. Esther Gwinnell, the psychiatrist who reviewed Mr. Sweeney's file on behalf of Standard, his attorney asked Dr. Gwinnell whether, in her opinion, she should have had the records from Dr. Yermak and Ms. Grossner when she first reviewed Mr. Sweeney's file. Dr. Gwinnell's answer establishes why there was no procedural flaw in the failure to have these records:

> Q: When you did the report of August 15, 2001, did you give any thought to the possibility of not doing an opinion until you received those other records?
>
> A. I felt at the time that I had good records from Dr. Nuschke, which were concurrent and covered a substantial period of time before the cease work date. Dr. Nuschke also treated Mr. Sweeney for some psychiatric illness and as a result was tracking symptoms and reporting on his psychiatric status from the records of May 1999 forward. In addition, there was Dr. Primelo's notes, which seemed fairly extensive; and he included his initial evaluation and referred to historical information.
>
> The information from Dr. Nuschke and from Dr. Primelo appeared very consistent, one with the other; and so it seemed to me that we did have a reasonable amount of information from which to come to a conclusion about what was supported in the claim file.

Deposition of Esther Gwinnell (hereinafter "Gwinnell Dep."), excerpts which are attached as Exhibit 1, pp. 46-47.

It is undisputed that Standard ultimately received all of the records from both Dr. Yermak and Ms. Grossner, that these records were reviewed by Jeffrey Webb, the Benefits Analyst, as well as Linda Wheeler, the Quality Assurance Analyst, and by Dr. Gwinnell. Thus, Plaintiff cannot maintain that he was in any way prejudiced by the failure to have these records

in Standard's possession at the time the initial determination was made.

Moreover, it is also undisputed that these records do not provide information helpful to Plaintiff's claim. Dr. Yermak's notes show that, within two weeks of her June 15, 2000 initial consultation, Mr. Sweeney was "calm [and] cooperative," his affect was "normal" and his mood was "fine." Her notes also show that, on September 12, 2000, Mr. Sweeney described himself as feeling "the best I have felt in thirty years," and on October 3, 2000, she described him as "doing very well." Defendant's Memorandum at p. 14. Dr. Yermak's notes do not make even a passing reference to the impact that Mr. Sweeney's job on his condition, much less recommend that he leave that position. The records obtained from Janet Grossner in early January 2002 -- received only after multiple requests to Ms. Grossner and Mr. Huber for these records -- describe Mr. Sweeney as "feeling much better" in September 2000, and refer to his decision to leave work as "retirement." Defendant's Memorandum at p. 16.

Simply put, there is no "procedural flaw" in Standard's initial denial of Plaintiff's claim for benefits. The record shows that the records at issue were received and considered by Standard by both the claims reviewers and the physician consultants, and, with the references to his relatively good health, ultimately supported Standard's decision to deny the claim.

II.   **Standard Did Consider The "High Stress" Nature Of Mr. Sweeney's Job.**

Plaintiff maintains that "the key question concerning Mr. Sweeney's mental disorder disability claim was the degree to which his high stress job would worsen his conditions and the alternative problem those conditions would make it impossible for him to handle the high stress of the job." Plaintiff's Motion p. 14. Plaintiff maintains that Standard failed to consider

4

this question because it is not specifically referenced in denial letters or the reports prepared by Dr. Gwinnell.

Although Defendant concedes that this exact question, as phrased by Plaintiff in his Motion, was not addressed in denial letters or Dr. Gwinnell's reports, the record contains ample evidence that this issue was thoroughly addressed by Dr. Gwinnell. In her August 15, 2001 memorandum, Dr. Gwinnell reported that she had "reviewed the entire claim file regarding Dennis Sweeney." Wheeler Aff., Ex. A, p. 387. This claims file included both the job description describing Mr. Sweeney's Vice President and General Manager job (Wheeler Aff., Ex. A, pp. 74-75) and the Employer's Statement filled out by Mr. Sweeney and his employer. Wheeler Aff., Ex. A, p. 83. When asked in her deposition whether she was aware of the nature of Mr. Sweeney's job, Dr. Gwinnell testified that she was:

> Q. You know what job Mr. Sweeney had, don't you?
> A. Yes.
> Q. What was it?
> A. Mr. Sweeney was a Vice President, a very high level person within his company.
>
> \*   \*   \*   \*
>
> Q. Now, was it your conclusion that Mr. Sweeney's job was stressful . . . ?
> A. Yes.

Gwinnell Dep. pp. 30-33. Dr. Gwinnell further explained that she perceived Mr. Sweeney to be under as "the kind of ordinary stress that we would associate with being a high powered

executive in a big company, i.e., …. the rapid pace, the responsibility, the high roller stakes… being responsible and competent in many areas." Gwinnell Dep. p. 32. Thus, there is no dispute that Dr. Gwinnell and Standard were fully cognizant of the nature of Mr. Sweeney's job duties and the fact that these duties involved stress.

Fully aware of the stressful nature of the job, in her August 15, 2001 report, Dr. Gwinnell opined that "there are no psychiatric symptoms of any severity which would represent impairments, limitations, or restrictions which would prevent Mr. Sweeney from functioning in his own occupation due to psychiatric illness." Wheeler Aff., Ex. A, p. 386. See also Gwinnell Dep. pp. 60-61 ("my conclusion based on the information in the file was that he -- that we did not have documentation of illness of such severity to prevent him from working in his own occupation").[1]

Likewise, the file shows that on April 10, 2002, Dr. Gwinnell discussed with Linda Wheeler, the Quality Assurance Analyst, the question of whether "job stress was a substantial cause of a psychological illness." Wheeler Aff., Ex. A, p. 563. Ms. Wheeler's notes show that Dr. Gwinnell opined that "the records show his condition improved even before cease work and continue to improve after that . . . not evidence symptoms job related." Id.

---

[1] The fact that Dr. Gwinnell took into account the stressful nature of Mr. Sweeney's executive position also refutes Plaintiff's argument that Standard erred by not conducting a more thorough vocational evaluation. Regardless of whether the vocational evaluation used by Mr. Webb was limited to the physical requirements of the job, it is undisputed that Dr. Gwinnell considered both the job description provided by Mr. Sweeney's employer, as well as fact that his job entailed the " kind of ordinary stress that we would associate with being a high powered executive in a big company." As a result, there was no "flaw" in Standard's decision not to have an additional vocational evaluation done to determine if the job involved any stress.

Thus, it is undisputed that Dr. Gwinnell, the psychiatrist who reviewed Mr. Sweeney's file, thoroughly addressed the question of whether his "high stress job would worsen his condition." Accordingly, there is no merit to Plaintiff's argument that the claims review process was tainted by the purported failure to consider this question.

### III. Standard Did Not Act Improperly By Relying Upon Non-Treating Physician Opinions.

Plaintiff argues that Standard acted improperly by relying upon the opinions of Drs. Gwinnell, Fancher, DeMots, and Spady, none of whom personally examined Mr. Sweeney. Plaintiff also challenges Standard's failure to obtain an "independent medical examination" ("IME").

As this Court has recently recognized, "the decision to rely upon a review of the written reports of other physicians does not render the denial arbitrary because, by doing so, Defendant violated no provision of the policy." Sapovits, 2002 WL 31923047, *15. In Sapovits, this Court rejected the plaintiff's argument that an insurance company is required to give substantial weight to the medical opinions of treating physicians, finding there is no such requirement where, as here, nothing in the long term disability plan addresses the issue of whether or not the insurance company can rely upon the opinions of medical professionals who have not seen, spoken with, or examined claimants. Id. See also Leonardo-Barone v. Fortis Insurance Co., 2000 WL 33666891 (E.D. Pa. 2000); Marques v. Reliance Standard Life Insurance Co., 1999 WL 1017475 *5, n.2 (E.D. Pa. 1999).

Here, Standard's decision to rely upon the opinions of his non-treating physicians, as well as its decision not to get an IME, are easily justified. As is argued in detail in

Defendant's summary judgment motion, the contemporaneous chart notes maintained by Plaintiff's healthcare providers -- Drs. Nuschke, Yermak, Primelo, and Ms. Grossner -- depict an individual who experienced three periods in 1999 and 2000 (May 1999 and June and August 2000) during which he experienced anxiety and depression from his bipolar disorder, but whose condition was otherwise stable prior to leaving work.  None of these treating physicians make any reference in their contemporaneous chart notes to the need for him to stop working.  Indeed, other than Dr. Nuschke's references to Mr. Sweeney losing interest in his job and perhaps delegating some responsibility, Mr. Sweeney's employment situation simply is not discussed in the chart notes.

After Mr. Sweeney's claim for benefits was denied in September 2000, Dr. Nuschke, Dr. Primelo and Ms. Grossner did provide letters asserting that Mr. Sweeney was unable to work in a high level executive position.  However, the physician's letters asserting that Mr. Sweeney was disabled, prepared in October 2001, were contradicted by their contemporaneous chart notes prepared at the time Mr. Sweeney made the decision to stop working.  In such circumstances, it was reasonable and appropriate for Standard to rely upon those contemporaneous chart notes, and to discount the subsequent opinions of the treating physicians.  Hevener v. Paul Revere Life Insurance Co., 2002 WL 1969492, *5 (E.D. Pa. 2002)(insurer properly relied on treating physician's chart notes rather than his subsequent letter stating that plaintiff was "totally disabled").

Moreover, Standard's decision not to schedule an IME is supported by the record in this case.  As explained by Dr. Gwinnell in her deposition, Dr. Primelo saw Mr. Sweeney just

one month after he stopped working, and described him as "emotionally as well as he had been in a long time." Dr. Gwinnell characterized this October 31, 2000 report from Dr. Primelo as "a new psychiatric evaluation shortly after the cease work date from an individual who is at that point not involved with the claimant and does a fresh de novo psychiatric interview and evaluation forming a diagnostic conclusion." Gwinnell Dep. pp. 21-22. Dr. Gwinnell further testified that this report described Mr. Sweeney as:

> stable on his current medicine, that he had periods of irritability but they were by and large successfully treated with current medicines. His mental status exam demonstrates no evidence of psychomotor abnormalities. He is someone who has linear thought processes who does not have psychotic delusions. He is described as having good, independent insight, good judgment and cognitive function was intact. His affect is reactive, meaning appropriate and flexible . . . It's an independent evaluation in the sense that he has not seen this man before and his conclusion at that point is that this gentlemen does have a psychiatric illness and that he is doing generally well.

Gwinnell Dep. pp 23-24.

### IV. Standard's Decision Was Not Based Upon Misinterpretations Of Isolated References In The Chart Notes.

Plaintiff contends that Standard made its decision "based primarily on isolated comments contained in the medical and psychiatric records in which references were made to Mr. Sweeney's needing to change his lifestyle or needing to retire." Plaintiff's Motion p. 24. In his Opposition, Plaintiff accuses Standard of "cherry-picking" isolated chart references to support its denial. However, the undisputed evidence shows that Standard's decision is supported by a multitude of entries made by Mr. Sweeney's healthcare providers. In Defendant's Memorandum in support of its Motion for Summary Judgment, Defendant cites four separate visits to Dr. Nuschke over a 12 month period to show that his psychiatric condition was

stable or improving.  In the case of Dr. Primelo, Standard found evidence to support its conclusion in the chart notes from <u>every</u> office visit Mr. Sweeney made to Dr. Primelo between October 31, 2000 and March 2001.  Defendant also draws support from four of Mr. Sweeney's six visits to Dr. Yermak.  Under these circumstances, there certainly is no evidence of comments being "cherry picked" or otherwise taken out of context.

      Plaintiff relies upon the Third Circuit's decision in <u>Skretvedt v. E.I. Dupont de Nemours & Co.</u>, 268 F.3d 168 (3rd Cir. 2001) for the proposition that Standard was inappropriately relying on selective portions of treating physician notes.  However, the <u>Skretvedt</u> decision shows quite the opposite.  In that case, one of plaintiff's treating physicians, Dr. Binhammer, indicated in a letter that Skretvedt's "depressive medical illness had improved," but *in the very same letter* also said that he "should not go back to his position as an environmental engineer because of the anxiety precipitated to him by this type of work and then the resulting breakdown in his psyche."  268 F. 3rd at 181-82.  The insurer relied on the portion of the letter stating that the condition "had improved" to deny the claim.  The Third Circuit rejected this selective reading of the doctors' letter and held that the insurer had acted arbitrarily and capriciously in denying the claim.

      In the instant case, there was no such conduct on the part of the insurer.  To the contrary, Standard relies upon multiple chart notes from three different doctors describing Mr. Sweeney as doing well, combined with the fact that none of those chart notes make any reference to the need for him to stop working.  Unlike <u>Skretvedt</u>, where the same chart notes which describe the plaintiff as doing well also state that he is unable to work in his own occupation,

none of the doctors' notes relied on by Standard also state that he is unable to work. Here, unlike Skretvedt, Mr. Sweeney's doctors do not make any such conclusions about his ability to work until he made his application for benefits, six months after he left work, and long after the chart notes cited by Standard as evidence that his decision to leave work was a voluntary one. Simply put, unlike Skretvedt, the doctor's statement relied upon by Mr. Sweeney are not contemporaneous with the time that he stopped working.

### V. Plaintiff Improperly Relies On Evidence Outside The Record.

In both his Motion for Summary Judgment and his Opposition to Standard's Motion for Summary Judgment, Plaintiff relies on evidence outside the record to support his argument that Standard's decision was "arbitrary and capricious." Specifically, Plaintiff relies upon December 2002 statements submitted by Dr. Primelo and his counselor, Janet Grossner, explaining that their chart notes were taken out of context. Plaintiff's Motion pp. 25-26; Plaintiff's Opposition p. 6. Plaintiff also relies upon deposition testimony from Mr. Sweeney concerning his purported reduction in hours of work prior to September 2000. Plaintiff's Opposition pp. 4-5.

It is undisputed that none of this information was presented to Standard during its administrative review of his claim. Indeed, in the case of his hours of work, it is undisputed that

Mr. Sweeney reported to Standard that he was working "40 plus" hours per week at the time he stopped working.[2] Wheeler Aff.. Ex. A, p. 83.

In the Third Circuit, it is black letter law that the Court may not consider evidence that was not presented to Standard during its review of the claim. <u>Mitchell v. Eastman Kodak Company</u>, 113 F.3d 433, 440 (3rd Cir. 1997). For this reason, the Third Circuit recently stated that a determination of whether a benefits denial was arbitrary and capricious "requires the determination of whether there was a reasonable basis for the administrator's decision, <u>based on the facts and circumstances known to the administrator at the time the decision was made</u>." <u>Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Health and Welfare Plan</u>, 298 F.3d 191, 199-200 (3rd Cir. 2002) (emphasis added). Plaintiff does not try to distinguish this authority, nor does he explain why the record should be reopened to allow the Court to consider these letters from his physicians or the testimony from Mr. Sweeney concerning his change in work schedule. Accordingly, the Court should disregard this information in making this determination as to whether or not Standard acted arbitrarily and capriciously in denying Mr. Sweeney's claim.

---

[2] Plaintiff also relies upon an October 2001 statement from Microsemi's controller, submitted more than a year after he stopped working, indicating that he was "regularly unable to work a full day." Opposition p.5. Although this statement was submitted to Standard during the claims review process, it is contradicted by Mr. Sweeney's April 2001 statement that he was working more than 40 hours per week when he stopped working. Moreover, it was prepared after Mr. Sweeney's claim had been denied, by an employer who had obvious incentives to assist its former employee obtain almost $7,000 per month in disability benefits.

### VI.    Plaintiff Has Failed To Cite Evidence In The Chart Notes To Support His Claim Of Disability.

In his Opposition to Standard's Motion for Summary Judgment, Plaintiff argues that the chart notes from Plaintiff's treating physicians support a finding that he was disabled. A careful analysis of Plaintiff's Motion shows that there is little, if any, support for such a conclusion. Indeed, given the multiple references in the chart notes which support Defendant's determination that Mr. Sweeney made a voluntary decision to leave his job, it appears that Plaintiff is the one who has "cherry picked" isolated references to try to bolster his claim.

First, Plaintiff cannot find a single entry in Dr. Nuschke's chart notes between May of 1999 and March of 2000 to support his claim that Plaintiff was having difficulty working as a Vice President and General Manager at Microsemi. Plaintiff's Opposition p. 3. Though he does cite a March 16, 2000 chart note from Dr. Nuschke, the only discussion of stress in this note is Dr. Nuschke's perception that Plaintiff "is under an inordinate amount of stress that he places upon himself," and his suggestion that Mr. Sweeney "reevaluate his work structure and try to get into a more reasonable lifestyle." Plaintiff's Opposition p. 3. The same chart notes also state that he should be "delegating some of the responsibility of his work." Such entries hardly show that Plaintiff was medically incapable of working; to the contrary, they show that Plaintiff needed to reassess the way he managed work stress.[3] This advice is certainly prudent, but likely

---

[3] Indeed, in 1999, Dr. Nuschke suggested that Mr. Sweeney "begin an exercise program and … and try to prioritorize his life and try to minimize his stress at work." Opposition p.3. Such advice is entirely consistent with Standard's conclusion that Mr. Sweeney needed to learn to manage stress through common stress reduction techniques, not to leave his job and seek long term disability benefits.

applies to a large percentage of the working population, and falls far short of qualifying an individual for long term disability benefits.

In his Opposition, Plaintiff also relies upon the fact that in June 2000, Dr. Nuschke referred Mr. Sweeney to Dr. Yermak. However, Mr. Sweeney does not dispute that just one week after the referral to Dr. Yermak, Mr. Sweeney was reported to be "calm [and] cooperative," his affect was "normal," and his mood was "fine." Wheeler Aff., Ex. A, p. 435. Plaintiff also does not dispute that, after an apparent relapse in August triggered by Plaintiff's failure to take his Paxil (Wheeler Aff, Ex. A, p. 437), by September 2000, Dr. Yermak was describing Mr. Sweeney as feeling "the best I have felt in 30 years." Wheeler Aff., Ex. A., p. 438.

The other chart notes relied upon by Plaintiff also do not support a finding that Mr. Sweeney was disabled on a long term basis. Specifically, Plaintiff relies upon the following entries:

- November 14, 2000 – "continues with generalized fatigue. Seems a bit depressed" (Opposition p. 7);

- One week hospitalization for ischemic colitis in December 2000 (Opposition p. 7);

- December 1, 2000 -- "gets upset when dealing with stressful situations . . . some anxiety" (Opposition p. 8);

- January 8, 2001 – "increase in fatigue" and "affect negative" (Opposition p. 8);

- February 23, 2001 – "continuing fatigue (Opposition p. 9);

- Three day hospitalization in February 2001 for gastritis (Opposition p. 7).[4]

While these chart notes certainly describe a man with medical problems, they do not portray someone who was unable to "perform with reasonable continuity" the material duties of his job. Such entries depict an individual who may, at times, need to take advantage of sick leave, Family and Medical Leave Act leave, and perhaps short term disability benefits, not someone who, over a sustained period, is unable to work as a Vice President and General Manager.

---

[4] Plaintiff also cites a handful of entries in Dr. Primelo's and Ms. Grossner's notes from April through July of 2001, seven to ten months after he stopped working. Opposition p.8. These entries, coming so long after the cease work date, do not show that Mr. Sweeney was medically unable to work in October 2000.

### VII. Mr. Sweeney Fails To Offer Evidence That He Was Disabled By Reason Of A Physical Disorder.

In his Motion for Summary Judgment and his Opposition to Defendant's Motion for Summary Judgment, Plaintiff makes only a half-hearted effort to argue that he was disabled by reason of a physical disorder. Specifically, in his Motion for Summary Judgment, Plaintiff attacks the fact that Dr. DeMots, the cardiologist who reviewed a portion of Plaintiff's file, and Dr. Fancher, one of the independent physical consultants, did not actually examine Mr. Sweeney. Plaintiff's Motion p.30-31.

As noted above, this Court has previously ruled in <u>Sapovits</u> that an insurer need not rely only on treating physician reports to justify a denial of benefits. This is especially so where, as here, the insurer has the opinion of a medical specialist such as Dr. DeMots to rely on. None of Plaintiff's treating physicians are cardiologists, and there is no reason for Standard to defer to their opinions over those of Dr. DeMots in this regard. Indeed, it does not appear that either Dr. Nuschke, Dr. Primelo, or Ms. Grossner maintains that Mr. Sweeney was disabled by reason of his cardiac condition.

With regard to his other physical ailments, Plaintiff makes virtually no argument in his Motion for Summary Judgment or his Opposition to support a conclusion that he was disabled by these conditions. Moreover, all of the purported procedural flaws identified by Plaintiff relate to the failure to obtain psychiatric records, or the failure to properly consider the impact of stress in Plaintiff's job. Thus, if the Court were to accept Plaintiff's argument that

Standard's decision to deny the claim is subject to "a high degree of skepticism" because of these procedural flaws, the heightened scrutiny should apply only to the question of whether he was disabled by reason of a mental disorder, and not to the question of whether his physical conditions were disabling. Stated otherwise, Plaintiff has presented virtually no evidence to support his claim that he had physical disorder and, therefore, if the Court were to grant Plaintiff's Motion of Summary Judgment, the Court should find that his benefits are subject to the Plan's 24 month Mental Disorder limitation.

## VIII. Conclusion

The evidence presented to Standard during the claims review process quite reasonably lead Standard to conclude that Mr. Sweeney made a voluntary decision to leave his high paying, high stress, executive position as Vice President and General Manager of Microsemi's RF Division to try pursue a lower stress lifestyle. Nothing in the file indicates that any of his physicians told him he <u>had</u> to stop working before he left Microsemi in October 2000, and Mr. Sweeney reported that up until the time he stopped working, his hours were "40 plus" per week. Moreover, his physician's chart notes showed that he had only episodic medical problems between May 1999 and October 2000, and that his psychiatric problems were well controlled almost immediately after he stopped working.

To the extent that Plaintiff argues that he continued to have health problems in April 2001 and beyond, such evidence only serves to undermine his claim. If, as Plaintiff maintains, it was the stress of his job that was making him ill, then his condition should not have been deteriorating eight to ten months after he stopped working. What the file appears to show

is that Mr. Sweeney has mental and physical problems that he endured while he was working, that he appeared to manage these conditions fairly well while he was working, and that the conditions do not appear to have changed significantly since he stopped working. Thus, there is no indication in the claims file that the conditions are any more disabling now then they were before Mr. Sweeney's decision to leave work in September 2000. Accordingly, summary judgment should be granted in favor of Standard and against Plaintiff on all counts in Plaintiff's Amended Complaint.

                                        Respectfully submitted,

                                        _____
                                        Jennifer E. Clark
                                        Attorney for Defendant
                                        Standard Insurance Company

Piper Rudnick LLP
3400 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
(215) 656-3300

Of counsel:
Eric Paltell
Kollman & Saucier, P.A.
8th Floor
20 South Charles Street
Baltimore, Maryland 21201-3225
(410) 727-4300

**CERTIFICATE OF SERVICE**

      I hereby certify that on this _____ day of January, 2003, a copy of the foregoing Opposition to Plaintiff's Motion for Summary Judgment and Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, was mailed, first class, postage prepaid to James T. Huber, Esquire, Huber & Waldron, 535 Hamilton Mall, Suite 301, Allentown, Pennsylvania 18101, attorney for Plaintiff.

      _____
      Jennifer E. Clark